# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

WALTER N. DIXON,

      Plaintiff,

v.                                       No. 2:19-CV-000945-JCH-GJF

STONE TRUCK LINE, INC., a foreign corporation,
ISMAIL Y. TAWIL,
RUSSELL STOVER CHOCOLATES, LLC, a foreign corporation,
and RYAN TRANSPORTATION SERVICE, INC.,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Walter N. Dixon ("Dixon") filed a *Motion for Leave to File Amended Complaint and Reconsider its Order Dismissing Defendants Ryan Transportation Service, Inc. and Russell Stover Chocolates, LLC (Doc. 57)* (ECF No. 69) on January 25, 2021. Plaintiff argues that the Court should permit him to add factual allegations against Defendants Ryan Transportation Service, Inc. ("Ryan") and Defendant Russell Stover Chocolates, LLC ("Russell Stover") based on evidence that he obtained in discovery that purportedly cure the deficiencies that resulted in the previous dismissal of claims against Ryan and Russell Stover. Plaintiff also argues that the Court may alternatively consider his motion as one to reconsider the Court's prior order of dismissal (ECF No. 57) under Rule 54(b). In further support of his motion for leave to file an amended complaint, Plaintiff subsequently filed on May 24, 2021, *Plaintiff's Motion for Leave to File Supplemental Evidence in Support of Plaintiff's Motion for Leave to File Amended Complaint and Reconsider its Order Dismissing Defendants Ryan Transportation Service, Inc. and Russell Stover*

*Chocolates, LLC (Doc. 69)* (ECF No. 81). According to Plaintiff, he recently obtained additional evidence in discovery that supports his request to amend his complaint and asks the Court for leave to file the evidence and to consider it. Defendants Ryan and Russell Stover oppose both motions. The Court, having considered the motions, briefs, arguments, evidence, and applicable law, concludes that the motion for leave to file supplemental evidence should be granted only for a limited purpose, and that the motion for leave to file an amended complaint that alleges negligence claims against Ryan and Russell Stover should be granted in part and denied in part. The Court will permit Plaintiff to file his proposed amended complaint asserting negligence claims against Ryan and Russell Stover for direct and vicarious liability, but the Court will deny the motion to amend as to the joint liability theory of liability (Count V) and as to a statutory employer theory of liability against Russell Stover because of futility of amendment.

## I.     FACTUAL BACKGROUND

### A.  Introduction

According to Plaintiff's first amended complaint ("FAC"), on October 28, 2018, Plaintiff Walter N. Dixon was operating his motorcycle with the right-of-way in Deming, New Mexico, when a commercial semi-truck operated by Defendant Ismail Y. Tawil ("Tawil"), acting in the course of his employment with Defendant Stone Truck Line, Inc. ("Stone Truck"), failed to yield to Dixon, made an unsafe left turn, drove into Dixon's line of traffic, and collided with Dixon. (FAC ¶¶ 1-2, 25, ECF No. 20.) Stone Truck was the owner of the semi-truck driven by Tawil and was Tawil's statutory employer. (*Id.* ¶¶ 8, 58.) At the time, Tawil was pulling a trailer loaded with goods being shipped by Russell Stover. (*Id.* ¶ 27.) Ryan, a business that brokers the transportation and shipment of goods across the United States, arranged for the transportation of Russell Stover's goods by Stone Truck. (*Id.* ¶¶ 18-19.)

### B.  Procedural History

Plaintiff filed suit against Tawil, Stone Truck, and Russell Stover for negligence on August 14, 2019 in state court. (Pl.'s Compl., ECF No. 1-2). After removal to federal court, on January 24, 2020, Plaintiff filed his FAC adding a claim for negligence against Ryan as well. (FAC ¶¶ 66-77, ECF No. 20.) In February 2020, Ryan and Russell Stover filed motions to dismiss (ECF Nos. 23, 31.) The Court *sua sponte* issued an Order Staying Discovery (ECF No. 43) as between all parties on April 21, 2020, until the presiding judge ruled on the pending motions to dismiss. While discovery was stayed, on June 24, 2020, Plaintiff filed a motion for leave to file his proposed second amended complaint ("SAC"). (Pl.'s Mot., ECF No. 49.)

On December 3, 2020, this Court entered a Memorandum Opinion and Order (ECF No. 57), granting Ryan's and Russell Stover's respective motions to dismiss under Rule 12(b)(6) for failure to state a claim against them. The Court also denied Plaintiff's motion to file his SAC based on futility. (Mem. Op. and Order 32-37, ECF No. 57.) Although the Court dismissed Ryan and Russell Stover from the case, the Court's opinion did not state whether it was with or without prejudice. (*See id.* at 39.)

Discovery resumed in this case on December 18, 2020, with entry of the Court's Order Setting Pretrial Deadlines and Briefing Schedule (ECF No. 61). That Order set a February 16, 2021 deadline for amending the complaint. (Order 1, ECF No. 61.) Shortly thereafter, Plaintiff requested Tawil's driver qualification file, electronic tracking or logs, among other discovery, which Plaintiff received on or about January 5, 2021. (*See* Pl.'s Reply, Ex. A, ECF No. 74 at 12-13 of 57.) On January 25, 2021, Plaintiff filed his motion for leave to file his proposed amended complaint and to reconsider (ECF No. 69). Months later, on May 24, 2021, Plaintiff moved for leave to file supplemental evidence he received in discovery that, according to Plaintiff, supports his motion to

amend. (*See* Pl.'s Mot. for Leave, ECF No. 81). The Court subsequently granted Plaintiff's motion to extend pretrial deadlines for discovery until April 15, 2022. (Order, ECF No. 101.)

### C.  New Allegations in Proposed Amended Complaint[1]

In the proposed Third Amended Complaint ("TAC"), Plaintiff alleges that Tawil violated the hours-of-service rules for the Federal Motor Carrier Safety Act ("FMCSA") and Federal Motor Carrier Safety Regulations ("FMCSR") for a shipment organized, controlled, and directed by Stone Truck, Ryan, and Russell Stover. (TAC ¶ 29, ECF No. 69 at 31 of 70.) According to Plaintiff, Russell Stover and Ryan set the unsafe schedule for the route and driving conditions and required "time is of the essence" performance of the shipment, despite that the shipment could not reasonably be completed within the time required without violating the hours-of-service rules of the FMCSA and FMCSR while driving in accordance with driving laws. (*Id.*) Plaintiff asserts that the "delivery timeline required, or reasonably could expect Defendant Tawil to exceed the hours of service mandated by the Federal Motor Carrier Safety Act and Regulations, drive at unsafe speeds and disregard other safety issues for a trip of approximately 1,800 miles (according to Google Maps), especially factoring in traffic, road conditions, inspections or other factors, such that the delivery timeline was unsafe and unreasonable." (*Id.* ¶ 52, ECF No. 44 of 70.) The TAC states that Ryan provided the schedule, logistics, mandatory documentation, tracking, and in-service communications en route. (*Id.* ¶ 46, ECF No. 69 at 37 of 70.) Plaintiff contends that Ryan is vicariously liable as the statutory employer of Tawil and as a motor carrier. (*Id.* ¶ 50, ECF No. 40-41 of 70.)

---

[1] The Court denied Plaintiff's initial proposed second amended complaint, so the current operative complaint is the first amended complaint. The proposed amended complaint set forth in ECF No. 69 is Plaintiff's third attempt to amend his complaint, so the Court will refer to the most recent proposed amended complaint as the third amended complaint (or "TAC") to distinguish it from the previous proposed second amended complaint ("SAC") (ECF No. 49-1), the filing of which the Court did not permit.

Plaintiff asserts that Tawil, in entering the intersection, "drove unsafely, impaired by driving excessive hours, affecting his alertness, by failing to maintain proper lookout and failing to yield the right-of-way to Plaintiff Dixon." (*Id.* ¶ 30, ECF No. 69 at 31-32 of 70.) Additionally, the TAC states that the semi-truck driven by Tawil was unsafe for operation on the public roadways because the electronic tablet on the front window was installed in a manner to cause distracted driving and block the visibility of the oncoming motorcycle driven by Dixon, and because the front turn signals were inoperable, as asserted by the police report made after the crash (*Id.* ¶ 32, ECF No. 69 at 32 of 70.)

Plaintiff contends that Stone Truck, Ryan, and Russell Stover knew or should have known from a reasonable investigation that Tawil was an unsafe driver because he had numerous driving citations issued to him and his driving record was in the possession of Stone Truck and available to Ryan and Russell Stover. (*Id.* ¶ 43, ECF No. 69 at 34-35 of 70.) Tawil's driving record showed the following: "12/8/17 speeding violation; 8/6/17 violation for failure to obey yield sign; 3/11/16 violation for unsafe operation of a motor vehicle; 9/22/15 violation for improper backing; 4/12/15 violation for false record of duty service; 12/10/14 violation for operating a motor vehicle without proper brakes; 2/7/14 motor carrier regulations violations; 12/10/12 motor carrier regulations violations; 7/8/11 violation of registration; 12/7/08 violation for failure to obey traffic signal or light; 11/2/08 violation for operating vehicle without lights; 11/10/07 violation for failure to obey traffic signal; 11/10/07 speeding violation; 11/7/07 violation for failure to obey traffic control device or sign; 10/26/07 speeding violation; 10/26/07 failure to answer a citation or pay fine; 5/29/07 speeding violation." (*Id.* ¶ 43, ECF No. 69 at 35 of 70.)

In the TAC, Plaintiff added more specific allegations about why Stone Truck was an unfit and incompetent motor carrier. (*See id.* ¶ 44, ECF No. 69 at 35-36 of 70.) According to Plaintiff,

Ryan and Russell Stover knew or should have known that Stone Truck had three cancellations of federally-mandated insurance policies by its former insurers; involvement in various injury crashes, including a fatal crash shortly before the injury in this case; a "non-ratable" safety rating issued by the FMCSA in 2018; an unsafe driving score above 4.5 issued by the Safety Measurement System for many months within close temporal proximity to the October 28, 2018 crash; a lack of regulatory-compliant safety training and continued-safety programs for drivers; and failed to qualify Tawil as required by the FMCSA. (*Id.* ¶¶ 44-45, ECF No. 69 at 35-36 of 70.)

Plaintiff further asserts in the TAC that the Agreement between Ryan and Russell Stover gave Ryan contractual control of the shipment and exclusive control of the persons operating the equipment or otherwise engaged in transportation services. (TAC ¶ 23, ECF No. 69 at 29 of 70.) Plaintiff alleges that the Broker Addendum is not part of the Agreement because it was expressly omitted pursuant to Paragraphs 27(a), 27(b), 27(d), and 38 of the Agreement and it was not signed by Russell Stover's Director of Transportation; and the Broker Addendum did not expressly exclude or control over the language of the Agreement. (*Id.*, ECF No. 69 at 30 of 70.) According to the TAC, the Broker Addendum was signed before or at the same time as the Contract, so Paragraph 27(a) of the Contract annulled and rendered unenforceable the Broker Addendum. (*See id.* ¶ 51, ECF No. 69 at 41-43 of 70.) Plaintiff also alleges that Ryan arranged for Stone Truck and Tawil to ship the goods; Ryan had exclusive control of the driver and commercial motor vehicle by contract and assumed full responsibility for the shipment; and Ryan certified in the Bill of Lading that it was functioning as the carrier. (*Id.* ¶¶ 20, 28, 50, ECF No. 69 at 28, 30-31, 41 of 70.) Alternatively, Plaintiff pleads in the TAC that Ryan misrepresented in the Bill of Lading its operations and capabilities to be that of a motor carrier and assumed responsibilities that it lacked. (*See id.* ¶ 22, ECF No. 69 at 29 of 70.)

Furthermore, Plaintiff asserts that Russell Stover is a licensed motor carrier and experienced in the qualifications, responsibilities, and duties required under the FMCSA and regulations for the selection of motor carriers and drivers, hours of service, and qualifications of trucking companies and drivers. (*Id.* ¶ 53, ECF No. 44 of 70.) Plaintiff contends that Russell Stover is the statutory employer of Tawil and that Tawil acted as its agent based on its control over and involvement with the process of transporting the shipment. (*Id.* ¶¶ 53, 90, ECF No. 69 at 45, 61 of 70.)

Based on these allegations, Plaintiff seeks to add a negligence claim against Ryan in Count III based on vicarious liability and direct negligence theories. (*Id.* ¶¶ 78-86, ECF No. 69 at 54-60 of 70.) Plaintiff contends that Ryan is vicariously liable as a motor carrier and statutory employer of Stone Truck and Tawil, is vicariously liable because Tawil acted as its agent, and is directly negligent for its hiring of Stone Truck, unsafe scheduling, and failing to exercise ordinary care in the maintenance, servicing, equipment, and inspection of the truck. (*See id.*) In Count IV, Plaintiff proposes to add a negligence claim against Russell Stover for vicarious liability and direct negligence (*See id.* ¶¶ 87-98, ECF No. 69 at 60-68 of 70.) Plaintiff asserts that Russell Stover is vicariously liable as a motor carrier and statutory employer of Ryan, Stone Truck, and Tawil, and because Tawil was acting as its agent. (*Id.* ¶¶ 90-91, ECF No. 69 at 60-61 of 70.) As for direct negligence, Plaintiff claims Russell Stover negligently failed to ensure the truck was properly and safely maintained and equipped, negligently hired its carriers, and negligently failed to prevent drivers from driving more than allowed by the hours-of-service laws, among other negligent acts. (*See id.* ¶¶ 93-95, ECF No. 69 at 62-65 of 70.) Finally, Plaintiff moves to add Count V for joint enterprise liability of Russell Stover, Ryan, and Stone Truck. (*Id.* ¶¶ 99-107, ECF No. 66-68 of 70.)

## II.     STANDARD

Generally, a court should freely give leave to amend a complaint when justice so requires. Fed. R. Civ. P. 15(a)(2). Whether to allow amendment of the pleadings is within the discretion of the trial court. *Minter v. Prime Equipment Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). The purpose of Rule 15 "is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Id.* at 1204 (internal quotations omitted). Leave sought must be freely given in the absence of any justifiable reason for the denial of the motion, such as undue delay, bad faith, repeated failure to cure deficiencies by amendments, undue prejudice, or futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). A proposed amendment is futile if the complaint, as amended, would be subject to dismissal for any reason, including that it would not survive a motion to dismiss or a motion for summary judgment. *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1239-40 (10th Cir. 2001); *Bradley v. Val-Mejias*, 379 F.3d 892, 901 (10th Cir. 2004) (quoting *Jefferson County Sch. Dist. v. Moody's Investor's Services*, 175 F.3d 848, 859 (10th Cir. 1999)).

After a scheduling order deadline has passed, a party seeking leave to amend must not only satisfy Rule 15(a)'s standard but also demonstrate good cause for seeking modification under Federal Rule of Civil Procedure 16(b)(4). *Gorsuch, Ltd., B.C. v. Wells Fargo Nat. Bank Ass'n*, 771 F.3d 1230, 1240-41 (10th Cir. 2014). Rule 16(b)(4)'s good-cause standard means showing that the scheduling deadlines cannot be met despite the plaintiff's diligent efforts, for example, if the plaintiff learned new information in discovery or if the underlying law changed. *Id.* at 1240. A court may generally find good cause when the plaintiff has been diligent, where the need for more time was not foreseeable or the party's fault, and when refusing to grant the amendment would create a substantial risk of unfairness to the party. *See Tesone v. Empire Marketing Strategies*, 942

F.3d 979, 988 (10th Cir. 2019). Mere carelessness does not satisfy the diligence requirement. *Id.* at 989. Although prejudice is relevant to the inquiry, the focus is on the moving party's reasons for seeking the change. *See id.* at 988. The Tenth Circuit has "noted the 'rough similarity' between the 'undue delay' standard of Rule 15 and the 'good cause' standard of Rule 16." *Bylin v. Billings*, 568 F.3d 1224, 1231 (10th Cir. 2009) (citing *Minter*, 451 F.3d at 1205 n. 4).

>    With respect to the standard for motions to reconsider, Rule 54(b) provides:
>
>    When an action presents more than one claim for relief … or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay. *Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment* adjudicating all the claims and all the parties' rights and liabilities.

Fed. R. Civ. P. 54(b) (emphasis added). A court may reconsider its ruling based on (1) newly discovered evidence previously unavailable, (2) a change in the relevant law, or (3) to correct clear error or to prevent manifest injustice. *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). A motion to reconsider is appropriate when the Court has misunderstood the facts, the arguments, or the law, but it "is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Id.*

## III.   ANALYSIS

### A.  Motion for leave to file supplemental evidence

Defendants argue that Plaintiff's motion for leave to file supplemental evidence is not permitted by the local rules. Defendants note that the supplemental argument in the motion is improper and should be stricken as a party must get leave of Court to file a sur-reply for argument that extends beyond a notice of supplemental authority. Moreover, Defendants contend that the motion is unnecessary because the evidence submitted was not new evidence and was known to

Plaintiff at the time that he filed his most recent motion to amend and to reconsider. Russell Stover seeks to strike the exhibits and the costs required to respond to the motion. (*See* Def. Russell Stover's Resp. 5-6, ECF No. 82.)

Plaintiff responds that the motion requests leave of Court, and the Court has discretion to construe the motion as a request to file a sur-reply. Plaintiff further asserts that he received responses to his requests for production (Exhibit K) from Stone Truck on April 30, 2021. (*See* Pl.'s Reply 5, ECF No. 87; Certificate of Service, ECF No. 79; Pl.'s Ex. K, ECF No. 81 at 30-39 of 39.) Plaintiff argues that this new evidence shows the necessity of reconsidering the dismissal of Ryan and Russell Stover from the case, because it shows Plaintiff did not have access to certain necessary documents until he was able to conduct discovery.

Defendants have raised the timeliness of Plaintiff's attempt to amend, contending that Plaintiff had evidence in his possession or could have discovered such evidence in the public domain when he filed his initial suit. The Court finds that the evidence is relevant to the issue of the timeliness of Plaintiff's motion to amend, to when he discovered certain evidence, and to his diligence. The Court will therefore grant the request to consider Plaintiff's supplemental evidence, but it will only consider the underlying evidence as it pertains to the timeliness and diligence issues. On the issue of futility of amendment, the Court will examine the factual allegations made in the proposed TAC, and any documents made central to and referred to in the complaint, but it will not consider the underlying evidence or the merits of evidence that a party may present at trial. *See Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009) (explaining that, on Rule 12(b)(6) motion, court does not weigh potential evidence that parties might present at trial; rather, it assesses on a plausibility standard whether plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted); *Pace v. Swerdlow*, 519 F.3d 1067, 1072-73 (10th Cir. 2008)

(explaining that court may properly consider on motion to dismiss documents central to plaintiff's claim and referred to in complaint, where document's authenticity is not in dispute). Consequently, the Court will grant Plaintiff's motion for leave to file supplemental evidence (ECF No. 81) and consider the evidence only for the limited purpose of analyzing the timeliness of Plaintiff's motion to amend and to reconsider.

The Court will not grant costs to Russell Stover. Nor will the Court grant Russell Stover's request to submit an additional brief to address and respond to the new exhibits and the argument set forth in the motion that is addressed to the merits of its motion for reconsideration and to amend. The Court is considering the exhibits for the limited purpose of timeliness and the parties have extensively briefed that issue. Russell Stover responded to both the motion to amend and the motion to supplement and the Court has fully considered its arguments. The Court does not find good cause to re-open the briefing further.

### B.  Motion to amend and to reconsider

#### 1.  Plaintiff's amendment is not untimely or unduly prejudicial

Plaintiff contends that, because the Court stayed discovery on April 1, 2020, it foreclosed Plaintiff's ability to discover the facts in Defendants' possession that revealed their liability. Dixon asserts that in the discovery process he obtained Tawil's driver qualification file and confirmation of load and trip documents that show Ryan as the carrier that accepted responsibility for the shipment.

Defendants argue that Plaintiff has not shown through evidence that he discovered new facts through discovery that were previously unavailable to him when he filed his prior SAC. According to Defendants, the load and trip documents, which included the shipping and delivery dates, were in his possession since February 2020 and nothing on the docket sheet suggests new

discovery was served on Plaintiff in the relevant time frame. Defendants contend that Tawil's driving records, Stone Truck's business history, and its Safety Measurement System score are available from the internet and can be obtained from court websites or background check companies at low cost. Accordingly, they argue that Plaintiff has not shown Rule 16 diligence or met the standard under Rule 54 or Rule 15 to permit amendment.

While some of the evidence supporting certain of the new allegations may have been publicly available, not all of it appears to be, and some pertinent information underlying Plaintiff's negligence theory was not in his possession at the time he filed the SAC. Plaintiff submitted evidence showing that he did not obtain Tawil's driver qualification file that was in Stone Truck's possession until discovery resumed in January 2021. (*See* Pl.'s Reply, Ex. A, ECF No. 74 at 12-13 of 57.) This discovery is the basis for some of the facts he alleges in the TAC that support his negligence claims, in particular his theory of negligent hiring. Because of this new discovery, the Court does not find that Plaintiff is attempting to make the complaint a moving target, but he is instead responding to the facts he discovers through the litigation process.

Moreover, Plaintiff filed his motion to amend prior to the most recent amendment deadline and discovery is ongoing until April 2022. The proposed amendments arise from the same subject matter as Plaintiff's earlier pleadings. As the Tenth Circuit noted, the expenditure of time, money, and effort on litigation alone is not a ground for finding prejudice. *Bylin v. Billings*, 568 F.3d 1224, 1230-31 (10th Cir. 2009). The discovery process is ongoing and will not end until next year. Trial is not until June 2022, more than six months away. The Court therefore finds that the delay and any prejudice is not undue and that there is good cause under Rule 16 for seeking modification under Rule 16(b)(4). *Cf. Minter*, 451 F.3d at 1206-08, 1214 (concluding district court erred in striking new claim from pretrial order because plaintiff provided adequate explanation for delay

in asserting new claim just three weeks before trial, shifting claim from manufacturer product liability against one defendant to alteration product liability against another defendant; amendment was in response to late disclosures from defendant, so it was not "untimely" or "unduly delayed").

"Rule 15 was promulgated to provide the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982). Although some new specific allegations in Plaintiff's TAC may have been available from public sources or are based on documents Plaintiff had, Plaintiff did not receive other documents that support other specific factual allegations until after discovery reopened. Because Plaintiff has good cause to amend his complaint to add these latter facts based on documents newly in his possession, the Court will consider the merits of the proposed complaint as a whole. The Court is not interested in parsing the basis of each new fact and striking facts based on insufficiently new evidence. To do so would elevate form over substance. Instead, the Court will turn to the merits of the TAC by examining whether it states a claim against Ryan and Russell Stover. *See Calderon v. Kansas Dept. of Social and Rehabilitation Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999) ("The liberal granting of motions for leave to amend reflects the basic policy that pleadings should enable a claim to be heard on its merits.").

### 2. Plaintiff's proposed amended complaint states negligence claims against Ryan and Russell Stover and is not futile

As discussed *supra*, a proposed amendment is futile if the amended complaint would be subject to dismissal. *Bradley*, 379 F.3d at 901. To survive dismissal, a complaint must set forth factual allegations that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When reviewing a plaintiff's complaint in ruling on a 12(b)(6) motion, the court must accept all well-pleaded allegations as true and construe them in a light most favorable to the plaintiff. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). When

determining futility at this stage, when discovery is not complete, the Court should assume the facts, as pled, are true, and rule as on a motion to dismiss, rather than examine futility on a motion for summary judgment standard. *See Orozco v. Edwards*, No. 1:18-cv-00769 KWR/SCY, 2020 WL 907767, at *2 (D.N.M. Feb. 25, 2020); *Smith v. Board of Regents of Univ. of New Mexico*, No. 10-CV-00518 MV/WDS, 2012 WL 13080781, at *2 (D.N.M. Mar. 26, 2012) ("The Court is not inclined to transform Rule 15(a)'s liberal 'when justice so requires' standard to that of a summary judgment motion.").

### a.   The TAC states a negligence claim against Ryan

Generally, a party who employs an independent contractor is not liable for the harm caused by the negligence of the independent contractor or its servants. Restatement (Second) of Torts § 409. The reason is that the party who hires an independent contractor has no right to control the manner in which the work is done because it is regarded as the contractor's own enterprise. *See Puckrein v. ATI Transport, Inc.*, 186 N.J. 563, 574, 897 A.2d 1034 (N.J. 2006). Exceptions to this rule exist, however, in situations in which the principal is directly negligent, such as where the principal hires an incompetent contractor, or where it retains control of the manner and means of doing the work that is the subject of the contract. *Id.*

### 1)   Plaintiff states a plausible direct negligence claim against Ryan based on negligent hiring and unsafe scheduling

According to Section 411 of the Restatement (Second) of Torts, an employer is liable for physical harm to third persons caused by its failure to use reasonable care to select a competent and careful contractor (a) to perform work that will involve a risk of physical harm unless it is skillfully and carefully done or (b) to perform any duty that the employer owes to third persons. *Talbott v. Roswell Hospital Corp.*, 2008-NMCA-114 ¶¶ 10-12, 144 N.M. 753 (quoting and adopting Restatement (Second) of Torts § 411). To succeed on a negligent hiring claim, the

plaintiff must show that "the employee was unfit, considering the nature of the employment and the risk he posed to those with whom he would foreseeably associate, and that the employer knew or should have known that the employee was unfit." *Valdez v. Warner*, 1987-NMCA-076, ¶ 11, 106 N.M. 305 (internal citation omitted). The harm the plaintiff suffered must have arisen out of the particular quality of the independent contractor which made it negligent for the employer to select that contractor to perform the work. *See Jones v. C.H. Robinson Worldwide, Inc.*, 558 F.Supp.2d 630, 643 (W.D. Va. 2008) (citing Restatement (Second) of Torts § 411 comment (b)).

Numerous courts have recognized a claim for negligent hiring of an independent contractor in the context of the selection of a motor carrier by a broker or shipper. *See Jones*, 558 F.Supp.2d at 641-42 (and cases cited therein, *L.B. Foster Co. v. Hurnblad*, 418 F.2d 727, 729 (9th Cir. 1969); *Hudgens v. Cook Indus., Inc.*, 521 P.2d 813, 816 (Okl.1973); *Puckrein*, 186 N.J. at 575). A company whose core purpose is the transportation of goods on the highways "has a duty to use reasonable care in the hiring of an independent trucker." *Puckrein*, 186 N.M. at 579. A fact finder may reasonably infer that a carrier or broker would be incompetent based on a "lack of experience, poor financial condition, failure to respect federal certificate requirements, and willingness to do business at cut rates." *Hurnblad*, 418 F.2d at 729-730.

In the Court's prior Memorandum Opinion and Order, the Court concluded that "the proposed second amended complaint does not allege additional non-conclusory allegations against Defendant Ryan Transportation to state a claim for negligent hiring." (Mem. Op. and Order 37, ECF No. 57.) Unlike the SAC, the TAC contains specific, non-conclusory facts explaining why Tawil was unfit and how Stone Truck and Ryan should have known he was unfit: Tawil's driving qualification file showed numerous traffic citations, including for speeding, failure to obey a yield sign, and unsafe operation of a motor vehicle. The TAC also has more specific, non-conclusory

facts showing the basis for why Ryan knew or should have known that it was hiring an unfit and incompetent motor carrier: Stone Truck had three cancellations of federally-mandated insurance policies by its former insurers; it had involvement in various injury crashes, including a fatal crash shortly before the injury in this case; it had a "non-ratable" safety rating issued by the FMCSA in 2018; it had an unsafe driving score above 4.5 issued by the Safety Measurement System for many months within close temporal proximity to the October 28, 2018 crash; it lacked regulatory-compliant safety training and continued-safety programs for drivers; and it failed to qualify Tawil as required by FMCSA laws. (TAC ¶¶ 43-45, ECF No. 69 at 34-36 of 70.) Presuming these allegations true, as this Court should on a Rule 12(b)(6) futility standard, they plausibly state a claim for negligent hiring. *Cf. Hurnblad*, 418 F.2d at 729-32 (refusing to overturn jury verdict against shipper for negligent selection of incompetent independent contractor to transport steel, despite shipper's lack of actual knowledge of carrier's incompetence, based on experienced shipper's failure to make reasonable inquiry as to carrier's competence); *Riley v. A.K. Logistics, Inc.*, No. 1:15-cv-00069-JAR, 2017 WL 2501138, at *5 (E.D. Mo. June 9, 2017) (denying broker's motion for summary judgment because factual questions existed for jury on whether broker negligently hired motor carrier where there was evidence motor carrier had poor BASIC scores and motor carrier's insurance was cancelled because of low scores); *Jones*, 558 F.Supp.2d at 647 (concluding fact question existed on whether broker breached appropriate duty of inquiry in selecting competent carrier that must be submitted to jury).

Plaintiff also asserts that the TAC contains facts showing Ryan's negligence for unsafe scheduling in violation of the FMCSA and FMCSR's hours-of-service laws for a time-is-of-the-essence shipment. Plaintiff alleges that Ryan knew or should have known that Tawil violated the hours-of-service rules of the FMCSA and FMCSR because it controlled the shipment and required

Tawil to drive with an unsafe schedule. (TAC ¶¶ 28-29, ECF No. 69 at 31 of 70.) Plaintiff additionally contends that Russell Stover and Ryan set the route and driving conditions that required time-is-of-the essence performance, performance of which could not reasonably be completed within the time required without violating driving and hours-of-service rules. (*Id.* ¶ 29.) According to Plaintiff, they required the shipment be picked up at 1300 hours on October 27, 2018 in Corsicana, Texas, and delivered by 900 hours on October 30, 2018, in Watsonville, California – a schedule that would reasonably anticipate Tawil driving in excess of the hours-of-service laws or driving at unsafe speeds. (TAC ¶ 52, ECF 69 at 44 of 70.) Plaintiff asserts that Tawil drove 780 miles by 1100 am, the time of the collision, which is in excess and in violation of the FMCSA and FMCSR, causing the collision. (*Id.*) As further evidence of control, Plaintiff alleges that Ryan provided the logistics, mandatory documentation, tracking, and in-service communications en route. (*Id.* ¶ 46, ECF No. 69 at 37 of 70.) These non-conclusory facts state a plausible claim against Ryan for direct negligence, and thus, Plaintiff has shown that amendment of the complaint to include this negligence theory would not be futile. *See* Restatement (Second) of Torts § 410 ("The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself.").

### 2) Plaintiff's direct negligence claim against Ryan is not preempted

In Ryan's initial motion to dismiss, it argued alternatively that Plaintiff's negligent hiring claim should be dismissed because it is preempted by the Federal Aviation Administration Authorization Act ("FAAAA"), 49 U.S.C. § 14501(c). (*See* Def. Ryan's Mot. to Dismiss, 17-23, ECF No. 31). In this Court's prior Memorandum Opinion and Order, it concluded that the allegations in the SAC did not state a claim against Ryan, and thus, it did not need to consider this

preemption issue. (Mem. Op. and Order 19 n.8, ECF No. 57.) Because the Court has determined herein that the allegations of the TAC have enough factual detail to state a plausible negligent hiring claim against Ryan, it must now determine whether amendment would be futile because the claim is subject to dismissal on this alternative preemption ground.

"The party claiming preemption bears the burden of showing with specificity that Congress intended to preempt state law." *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 489 n.4 (10th Cir. 1998) (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)). The FAAAA expressly preempts certain state laws related to brokers:

> [A] State … may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier … or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1). The phrase "other provision having the force and effect of law" includes common law claims. *Northwest Inc. v. Ginsberg*, 572 U.S. 273, 284 (2014). The FAAAA, however, also contains a "safety exception," expressly stating that the preemption provision "shall not restrict the safety regulatory authority of a State with respect to motor vehicles....'" 49 U.S.C. § 14501(c)(2).

To determine what domain Congress intended to preempt, the statutory language is the best evidence of that intent. *See Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013); *Boyz Sanitation Serv., Inc. v. City of Rawlins, Wyoming*, 889 F.3d 1189, 1198 (10th Cir. 2018) (explaining that in determining scope of an express preemption clause, courts "must use ordinary principles of statutory interpretation to evaluate whether the state law falls within the scope of the federal provision precluding state action"). Congress enacted the Airline Deregulation Act of 1978 ("ADA"), followed by the Motor Carrier Act of 1980, largely to deregulate the domestic airline industry and the trucking industry, respectively. *Dan's City*, 569 U.S. at 255-56. To prevent States

from undoing federal deregulation, Congress included preemption provisions in the ADA, prohibiting States from enacting or enforcing any law "related to a price, route, or service of an air carrier," 49 U.S.C. § 41713(b)(1), and in the FAAAA, prohibiting state laws "related to a price, route, or service of any motor carrier ... with respect to the transportation of property," 49 U.S.C. § 14501(c)(1). *See Dan's City*, 569 U.S. at 255-56. Congress enacted both the ADA and the FAAAA to maximize reliance on competitive market forces to lower fares and provide better service and to preempt state airline and trucking regulations. *See Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 367-68, 371 (2008). Decisions interpreting the ADA's preemption provision thus inform interpretations of the FAAAA's preemption clause. *See id.* at 370.

There is, however, a presumption against preemption where a federal statute contains a provision preempting state law claims that relate to areas of traditional state regulation or police power. *Lupian v. Joseph Cory Holdings LLC*, 905 F.3d 127, 131 (3d Cir. 2018) (citing *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005), and *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). To date, neither the Supreme Court nor the Tenth Circuit have addressed the specific issue whether the FAAAA preempts negligence or negligent-hiring claims in personal injury suits against brokers. *See Lopez v. Amazon Logistics, Inc.*, 458 F.Supp.3d 505, 512 (N.D. Tex. 2020). Federal district courts have split both on the issue of whether negligent hiring claims against a broker are "related to" a broker's services and on whether the safety exception applies to negligent hiring claims. *See Miller v. C.H. Robinson Worldwide, Inc.*, 976 F.3d 1016, 1023 (9th Cir. 2020) (and cited cases). Only one circuit court – the Ninth Circuit – has yet to rule on these issues. *See id.* at 1020, 1023. Given the lack of binding Supreme Court or Tenth Circuit precedent on either issue, the Court will begin its analysis first

with general Supreme Court and Tenth Circuit law and then consider whether this circuit is likely to follow the Ninth Circuit's specific analysis of the issue.

### a) Dixon's negligent hiring claim against Ryan is "related to" broker services

The term "related to" encompasses "state laws 'having a connection with or reference to' carrier 'rates, routes, or services,' whether directly or indirectly." *Dan's City*, 569 U.S. at 260 (quoting *Rowe*, 552 U.S. at 370). "[P]re-emption occurs at least where state laws have a 'significant impact' related to Congress' deregulatory and pre-emption-related objectives." *Boyz Sanitation*, 889 F.3d at 1198–99 (quoting *Rowe*, 552 U.S. at 371) (other citation omitted). Although the meaning of "related to" is broad, the sky is not the limit. *Dan's City*, 569 U.S. at 260. Section 14501(c)(1) "does not preempt state laws affecting carrier prices, routes, and services in only a tenuous, remote, or peripheral ... manner." *Id.* at 261 (internal quotation marks omitted) (quoting *Rowe*, 552 U.S. at 371). Also "massively" limiting the scope of the FAAAA's preemption provision is a phrase missing in the ADA -- the addition of the words "with respect to the transportation of property." *Dan's City*, 569 U.S. at 261 (quotation omitted).

In *Dan's City*, the Supreme Court concluded the FAAAA preemption provision did not apply to the plaintiff's state law claims regarding the storage and disposal of the plaintiff's car after the completion of a towing job because the claim did not involve "the transportation of property." *Id.* at 261-62. The Supreme Court noted that the defendant's transportation service in moving the car from the parking lot ended before the conduct upon which the plaintiff based his claims, which challenged the abandoned vehicle disposal regime. *Id.* at 262-63. By way of contrast, in *Rowe*, the Supreme Court held the FAAAA preempted two provisions of a State tobacco law that regulated the delivery of tobacco to customers within the State. *Rowe*, 552 U.S. at 367. In

forbidding licensed tobacco retailers from using a delivery service unless the service followed specific delivery procedures, the state law created a direct "connection with" motor-carrier services and had a significant, adverse impact on what the federal law sought to avoid – "a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." *Id.* at 371-72.

Having considered cases on both sides of this preemption issue, the Court finds more persuasive the reasoning of the courts that have concluded that personal injury negligent hiring claims against brokers fall within the preemptive scope of 49 U.S.C. § 14501(c). In *Miller v. C.H. Robinson Worldwide, Inc.*, the Ninth Circuit recently held that a negligent hiring claim brought against a broker "related to" broker services with respect to the transportation of property. *Miller*, 976 F.3d at 1024-25. The *Miller* court explained that the selection of motor carriers is one of the core services of brokers; and the negligent hiring claim interferes at the point where the broker arranges for transportation by a motor carrier. *Id.* at 1024. Consequently, the Ninth Circuit held that a negligent hiring claim against a broker is directly connected with broker services. *Id.*

Numerous other federal district courts have similarly concluded that a negligent hiring claim is directly "related to" the broker's performance of this service with respect to the transportation of property because its services involve arranging for a motor carrier to transport property. *See*, *e.g.*, *Loyd v. Salazar*, 416 F.Supp.3d 1290, 1297 (W.D. Okla. 2019) (collecting five district court cases reaching same result); *Creagan v. Wal-Mart Trans., LLC*, 354 F.Supp.3d 808, 813 (N.D. Ohio 2018) (on appeal) ("[B]ecause the negligent hiring claim seeks to enforce a duty of care related to how [the broker] arranged for a motor carrier to transport the shipment (the service), the claim falls squarely within the preemption of the FAAAA."). *See also Quinones v. Ladejo*, 2021-Ohio-1988, __ N.E.3d __ (Ohio Ct. App.) (concluding that negligence claims against

broker fell within the FAAAA's preemption provision because of the "broad language employed in the general preemption provision, and because the negligence claim pertains to the selection of carriers, which is the core function of a broker by statutory definition"). Courts have pointed out that the term "brokerage service," defined as "the arranging of transportation or the physical movement of a motor vehicle or of property," 49 C.F.R. § 371.2(c), supports the conclusion that a negligent hiring claim directly implicates how a broker performs its central function of arranging for the transportation of property by hiring motor carriers. *See*, *e.g.*, *Gillum v. High Standard, LLC*, Civil Action No. SA-19-CV-1378-XR, 2020 WL 444371, at \*4-5 (W.D. Tex. Jan. 27, 2020) (citation and internal quotation marks omitted).

The Court recognizes that other district courts have found no preemption because a negligent hiring action is too "tenuous, remote, or peripheral" from the "services" of a broker. *See*, *e.g.*, *Mann v. C.H. Robinson Worldwide, Inc.*, No. 7:16-cv-104, 2017 WL 3191516, at \*7 (W.D. Va. July 27, 2017) (reasoning that negligent hiring claim against broker is general law aimed at all persons to act with reasonable care in making hiring decisions, as opposed to direct regulation of brokers that dictates specific way that they had to deliver products); *Huffman v. Evans Transp. Services, Inc.*, Civil Action No. H-19-0705, 2019 WL 4143896 (S.D. Tex. Aug. 12, 2019). Yet, it is hard to see how a negligent hiring claim does not significantly affect a broker's services. As the *Gillum* court convincingly explained, allowing such a claim to proceed would impose on brokers the duty to inspect a motor carrier's background and investigate how a carrier selects and trains drivers. *Gillum*, 2020 WL 444371, at \*6. Negligent hiring claims impose duties on brokers that would have a significant impact upon their ability to arrange for transportation of property, and thus, they are not the type of claims that have only a tenuous, remote connection to the services of the broker. *Cf. Morales*, 504 U.S. at 390 (concluding that state airline fare advertising guidelines

were preempted by ADA because they imposed obligations that would have significant impact upon airlines' ability to market their product, and hence significant impact upon the fares they charge).[2] For all these reasons, the Court concludes that Dixon's negligent hiring claim falls within the general preemption provision of the FAAAA.

>   b) **FAAAA's safety exception applies to Dixon's negligent hiring claim against Ryan**

The safety exception provides that the FAAAA preemption clause

> *shall not restrict the safety regulatory authority of a State with respect to motor vehicles*, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization[.]

49 U.S.C. § 14501(c)(2)(A) (italics added). At issue here is the exception for "the safety regulatory authority of a State with respect to motor vehicles." In determining whether a negligent hiring claim against a broker is saved from preemption, the Court must determine whether the common-law claim constitutes an exercise of a state's "safety regulatory authority," and whether the claim is "with respect to motor vehicles." *See Miller*, 976 F.3d at 1026-31; *Lopez*, 458 F.Supp.3d at 515.

>   (1) **"Safety regulatory authority of a State" encompasses common law claims**

---

[2] Other courts found significant that the ADA requires air carriers to maintain insurance coverage for personal injury claims; but in the FAAAA, a similar provision requires such insurance for motor carriers and freight forwarders, but not brokers. *See Creagan*, 354 F.Supp.3d at 814 ("The FAAAA mandates that to register as a motor carrier, the entity must carry liability insurance in an amount 'sufficient to pay… for each final judgment against the registrant for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles, or for loss or damage to property ..., or both.' 49 U.S.C. § 13906(a)(1). The FAAAA does not impose the same requirement on brokers. Not only does this affirmatively establish that a motor carrier may be liable for these types [of] negligence actions, but also the omission of the same language with respect to broker evinces Congressional intent that brokers not be liable for this conduct.") While the insurance distinction between brokers and motor carriers is notable, ultimately, this Court finds more persuasive the reasoning of the courts that focus on the language of the preemption clause and how the negligent hiring claim derives from and impacts the service the broker provides.

Some district courts limit "safety regulatory authority" to mean state regulations. *Gillum*, 2020 WL 444371, at \*4-5 (quoting *Huntington Operating Corp. v. Sybonney Express Inc.*, No. H-08-781, 2020 WL 1930087, at \*3 (S.D. Tex. May 11, 2010)). Other courts – including the only federal circuit court to have ruled yet on the issue – have taken the opposite view and held that the phrase "safety regulatory authority" is not limited to state regulations and covers common-law tort claims. *See Miller*, 976 F.3d at 1026-29; *Lopez*, 2020 WL 2065624, at \*6.

"Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property, § 14501(c)(1), 'not restrict' the preexisting and traditional state police power over safety." *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 439 (2002). The Ninth Circuit in *Miller* relied in large part on the Supreme Court's decision in *Ours Garage*. *Miller*, 976 F.3d at 1026-30. In *Ours Garage*, the Supreme Court rejected the narrowest possible construction of the safety exception to only cover the regulatory authority of the State by reading the exception to exempt the safety regulatory authority of municipalities. *See Ours Garage*, 536 U.S. at 440-42. Examining the legislative history of the statute, the Supreme Court noted that a key interest group, the American Trucking Association, endorsed the statute and its deregulatory aim subject to conditions that allowed regulatory protection for safety. *See id.* at 440-41.

The Ninth Circuit likewise found significant that Congress passed the FAAAA primarily to prevent States from regulating economic aspects of the trucking industry. *Miller*, 976 F.3d at 1026. The *Miller* court construed the reference to "safety regulatory authority of a State" broadly and explained that common law liability historically was a way in which the State regulated safety. *Miller*, 976 F.3d at 1026. Further, the Court noted that some States codify their common law, so it seems unlikely that Congress made the exception available to only those codifying States, given

24

its goal of uniformity. *Id.* at 1027. Finally, the Ninth Circuit relied on the presumption that when the text of a preemption clause is susceptible of more than one plausible reading, courts should accept the reading that disfavors preemption because it is consistent with both federalism principles and the historic primary role of the states in regulating health and safety. *Id.* at 1027-28.

The Court finds the Ninth Circuit's reasoning persuasive. The phrase "safety regulatory authority of a State" is not clear as to Congress's intent. It is not defined in the Act. *Id.* at 1026. While the term "regulation" arguably could be limited to state regulations, Congress used the phrase "regulatory authority," despite having used the term "regulation" in other provisions of the Act. *Lopez*, 458 F.Supp.3d at 515. Moreover, common law liability has historically "formed the bedrock of state regulation, and common law tort claims have been described as 'a critical component of the States' traditional ability to protect the health and safety of their citizens.'" *Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 86 (2d Cir. 2006) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 544 (1992) (Blackmun, J., concurring in part and dissenting in part)). Therefore, a reasonable interpretation of "safety regulatory authority of a State" is that it encompasses state common law claims. *See Miller*, 976 F.3d at 1026; *Lopez*, 458 F.Supp.3d at 515 (viewing as "nondeterminative" the fact that "the enforcement mechanism is private action" because "state common law claims exist by force of state authority"); *Morales v. Redco Transp. Ltd.*, Case No. 5:14-cv-129, 2015 WL 9274068, at *3 (S.D. Tex. Dec. 21, 2015) ("negligence claims can certainly fall within states' regulatory authority, because negligence is the common-law regulation of misconduct"); *Quinones*, 2021-Ohio-1988, ¶¶ 18-21 (adopting *Miller* court's reasoning).[3]

---

[3] Ryan argues that the public safety exception does not apply to common law negligent hiring claims, relying partially on the Supreme Court's statement in *Ours Garage* that the purpose of the exception was to leave intact the "traditional state police power over safety." (Ryan's Reply 8-9, ECF No. 37 (quoting *Ours Garage*, 536 U.S. at 439).) Because a state's "police power" is exercised by state legislatures, Ryan asserts that the exception does not apply to common

According to the Tenth Circuit, if a statute is ambiguous, courts turn to legislative history and the underlying public policy of the statute. *Boyz Sanitation*, 889 F.3d at 1199. As the Supreme Court and Ninth Circuit explained, aspects of the legislative history indicate that Congress intended preemption of state economic regulation, not safety, justifying a broader reading of the safety exception. *See Ours Garage*, 536 U.S. at 440-41; *Miller*, 976 F.3d at 1026. According to a House Conference Report, one of Congress' findings regarding the preemption provision of intrastate transportation of property is that "certain aspects of the State regulatory process should be preempted." H.R. Rep. No. 103-677, at 39 (1994) (Conf. Rep.). The preemption provision for both intrastate and interstate transportation uses broad language that covers common law. *See* 49 U.S.C. § 41713(b) ("49 U.S.C. 14501(b) ("a State … may not enact or enforce a law, regulation, or other provision having the force and effect of law"); 49 U.S.C. § 14501(b) (preempting State "law, rule, regulation, standard, or other provision having the force and effect of law"); *id.* § 14501(c) ("law, regulation, or other provision having the force and effect of law"). That the House Report used the term "State regulatory process" to describe preempted laws, regulations, *and* common law lends further support to a similarly broad construction of "regulatory authority of a State" to include common law claims.

Moreover, the Fifth Circuit in the related context of the ADA found significant the lack of legislative history indicating Congress intended to displace application of state tort law to personal physical injury caused by aircraft operations and the failure to provide a federal remedy for such injured persons. *See Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 338 (5th Cir. 1995). More

---

law claims. (*Id.*) The Ninth Circuit, however, considered the same argument but concluded that, while "police power" does generally refer to legislation, the statement by the Supreme Court in *Ours Garage* should not be interpreted in such a precise way, because the Supreme Court was looking at municipal regulations that undisputedly were an exercise of "police power." *Miller*, 976 F.3d at 1028. The Supreme Court had no reason to consider whether the safety exception is broader than its "police power" language suggested. *Id.*

recently, the Fifth Circuit has continued to construe the safety exception broadly. *See VRC LLC v. City of Dallas*, 460 F.3d 607, 612 (5th Cir. 2006) ("Case law both predating and applying the principles discussed in *Ours Garage* has on the whole given a broad construction to the safety regulation exception.").

"In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." *Bates*, 544 U.S. at 449 (internal quotations omitted). "Congress' clear purpose in § 14501(c)(2)(A) is to ensure that its preemption of States' economic authority over motor carriers of property, § 14501(c)(1), 'not restrict' the preexisting and traditional state police power over safety." *Id.* at 439. It is not clear that the FAAAA sought to supplant state common law torts related to public safety. *Cf. Ours Garage*, 536 U.S. at 434 (concluding that FAAAA does not provide requisite "clear and manifest indication that Congress sought to supplant local authority," despite disparate inclusion and exclusion of words "political subdivisions"). "If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." *Bates*, 544 U.S. at 449.

In summary, the Court agrees with the Ninth Circuit's reasoning that the legislative history and public policy of the FAAAA supports a broader interpretation of the safety exclusion to save certain common law torts from preemption. The presumption against preemption also applies where, as here, the statutory language is ambiguous. In keeping with federalist principles, the safety exclusion should be broadly interpreted to retain the States' historic role over safety.

### (2) Phrase "with respect to motor vehicles" is broad and covers negligent hiring claims against a broker

The next question is whether a negligent hiring claim against a broker that serves to protect the motoring public by discouraging the unsafe selection of motor carriers is a claim "with respect

to motor vehicles." Some courts have said, no, interpreting this phrase to more narrowly require that the law in question be a regulation of a motor vehicle or that the defendant have control over a regulated motor vehicle for the exception to apply. *See*, *e.g.*, *Creagan*, 354 F.Supp.3d at 814 (concluding that negligent hiring claim against broker was not within safety exception because claim imposes duty on service of broker and does not regulate motor vehicles); *Gillum*, 2020 WL 444371, at *4 (deciding safety exception did not apply to negligent hiring claims because "the FAAAA preemption provision applies broadly to any 'law, regulation, or other provision having the force and effect of law,' whereas the carve-out provision applies more narrowly to the 'safety regulatory authority' of a state with respect to motor vehicles"); *Volkova v. C.H. Robinson Co.*, No. 16 C 1883, 2018 WL 741441, at *4 (N.D. Ill. Feb. 7, 2018) (rejecting argument "that a state common law claim for negligent hiring constitutes a safety regulation of a motor vehicle"). These courts rejected a broad interpretation as contrary to Congress' intent in providing specific exceptions to federal preemption. *See Loyd*, 416 F.Supp.3d at 1299-1300 (concluding that negligent hiring or brokering claims concern motor carriers, with only indirect concern for safety of motor vehicles, and thus, such claims are not saved by the safety exception).

The Supreme Court defined the phrase "with respect to" in the FAAAA clause "with respect to the transportation of property" to mean "concern[s]." *See Dan's City*, 569 U.S. at 261. Congress, by choosing a phrase meaning "concerns," intended a broad reading of "with respect to motor vehicles" to include direct or indirect connections. *See id.* at 260-61; *Miller*, 976 F.3d at 1030; *Quinones*, 2021-Ohio-1988, ¶¶ 20-21. The Fifth Circuit has also indicated support for a broader interpretation of the safety exception, observing that the term "motor vehicle safety," defined in the "Motor Vehicle Safety" chapter of Title 49, is "obviously narrower than the term 'safety regulatory authority of a State with respect to motor vehicles'" used in section

14501(c)(2)(A). *Cole v. City of Dallas*, 314 F.3d 730, 733 (5th Cir. 2002) (declining "to elasticize Congress's economic goal by narrowly interpreting 'safety regulatory authority of a State with respect to motor vehicles'" and finding that city's criminal history regulations for wrecker drivers were not preempted). Negligent hiring claims against a broker indirectly concern motor vehicles because they encourage the selection of safe and competent motor carriers to prevent injuries caused by motor vehicles. *See Miller*, 976 F.3d at 1030-31 (negligence claims against brokers sufficiently connected to motor vehicles for safety exception to apply to claims); *Taylor v. Sethmar Transp., Inc.*, Civil Action No. 2:19-cv-00770, 2021 WL 4751419, at *15-16 (S.D. West Virginia Oct. 12, 2021) (concluding that "with respect to motor vehicles" encompasses indirect safety regulations of motor vehicles, like negligent selection claims that incentivize brokers to select safe and competent motor carriers to drive motor vehicles in the state); *Lopez*, 458 F.Supp.3d at 516 (determining "that a claim seeking damages for personal injury against a broker for negligently placing an unsafe carrier on the highways is a claim that concerns motor vehicles and their safe operation"); *Finley v. Dyer*, NO. 3:18-CV-78-DMB-JMV, 2018 WL 5284616 at *6 (N.D. Miss. Oct. 24, 2018) (concluding that negligent hiring claims against brokers are centered on brokers' efforts to place trailers on highways, and thus, concern motor vehicles so as to fall under safety exemption provision).

For the same reasons the Court finds it more persuasive to interpret the "safety regulatory authority of a State" broadly, the Court likewise concludes that "with respect to motor vehicles" should be read broadly. Again, the legislative history and public policy of the FAAAA, as well as federalist principles, support a broader interpretation of the safety exclusion that retains the States' traditional role over public safety, and the presumption against preemption should apply when the statutory language is ambiguous. Accordingly, Plaintiff's negligent hiring claim against Ryan falls

within the safety regulatory authority of the State with respect to motor vehicles and is therefore

not preempted by the FAAAA. Consequently, permitting Plaintiff to amend his complaint to add

the claim would not be futile.

### 3) The TAC states a plausible negligence claim against Ryan based on vicarious liability as a statutory employee and under agency theory

In the FAC, Plaintiff asserted vicarious liability against Ryan as a motor carrier and

statutory employer of Stone Truck and Tawil and as the principal with a right to control its agent,

Tawil, under agency principles and the doctrine of *respondeat superior*. (*See* FAC ¶¶ 66-77, ECF

No. 20.) The TAC asserts that Ryan held itself out as a "carrier" based on the bill of lading and

that it legally and contractually bound itself to transport the shipment and accepted responsibility

for the shipment. (TAC ¶¶ 20, 23, 50, ECF No. 69 at 28-29, 40 of 70.) Despite similar language in

the SAC, the Court concluded in its order that, based on the record, Plaintiff had not shown that

the proposed second amended complaint would not be futile. (*See* Mem. Op. and Order 32-37,

ECF No. 57). The Court explained that the contract was signed subject to the Broker Addendum,

the terms of which expressly and clearly stated that it controlled in the event of any conflicting

terms contained in the Contract. (*Id.* at 34.) The Court found that the Broker Addendum

unambiguously stated that Ryan held itself out to be a broker and that reference to Ryan as a

"Carrier" in the Contract was strictly for the parties' convenience and did not create or imply a

holding out or assumption by Ryan of motor carrier authority…." (*Id.* at 34-35 (quoting Broker

Addendum, ECF No. 48-1 at 31 of 31).)

Plaintiff argues that the Court erred in its analysis because it failed to consider terms of the

Contract that inject ambiguity as to whether the Contract or the Broker Addendum controls.

Plaintiff also asserts that the Court should reconsider its ruling because the TAC asserts facts that

the Broker Addendum was not valid. In the TAC, Plaintiff alleges that the Agreement between

Ryan and Russell Stover gave Ryan exclusive control of the persons operating the equipment or otherwise engaged in transportation services; Ryan legally and contractually controlled and accepted responsibility for the shipment; the Broker Addendum was not part of the Agreement and was not referenced in the Agreement; the Broker Addendum was expressly omitted pursuant to Paragraphs 27(a), 27(b), 27(d), and 38 of the Agreement; the Broker Addendum was not signed by Russell Stover's Director of Transportation; and the Broker Addendum did not expressly exclude or control over the express language of the Agreement. (*See* TAC ¶¶ 23, 47, 51, ECF No. 69 at 30, 37-38, 41 of 70.) The TAC states that the Contract in paragraphs 3(a) and 3(b) establishes that Ryan was the motor carrier and accepted the shipment in that capacity. (*Id.* ¶ 50, ECF No. 69 at 41 of 70.) Plaintiff also alleges that Ryan had exclusive control of the driver and motor vehicle by contract and assumed full responsibility for the shipment, and that Ryan certified in the Bill of Lading that it was functioning as the carrier. (*Id.* ¶¶ 20, 28, ECF No. 69 at 28, 31 of 70.)

According to the TAC, paragraph 27 of the Contract provides:

ENTIRE AGREEMENT; MODIFICATION; WAIVER; CONTROLLING DOCUMENTS,

(a) This Contract and the Appendices A,B,C, attached hereto, constitute the entire agreement between the parties with respect to the subject matter hereof, and all previous communications, statements and instruments are hereby withdrawn and annulled.

(b) This Contract may not be changed, or modified in any manner except by an instrument in writing signed on behalf of each of the parties hereto by their duly authorized representatives….

(d) The terms of this Contract and Appendices shall control over any other document attached hereto or incorporated by reference. Notwithstanding anything to the contrary contained in Appendix E, the terms and conditions of this Contract shall supersede any inconsistent terms and conditions in any bill of lading or other shipping document, tariff, service guide, or similar document.

(TAC ¶ 51, ECF No. 69 at 42 of 70 (bold emphasis removed).) Plaintiff alleges, in the absence of contrary evidence, that the Broker Addendum was signed before or at the same as the Contract, and thus paragraph 27(a) annuls and renders unenforceable the Broker Addendum. (*Id.* at 42 of 70.)[4] Plaintiff further asserts, in the absence of contrary evidence, that the Broker Addendum was not signed by duly authorized representatives, and it is unenforceable based on paragraph 27(b); the Broker Addendum does not apply to Russell Stover because it is not named therein; it is not genuine; and paragraph 27(d) of the Contract renders the terms of the Broker Addendum unenforceable, or at least ambiguous. (*Id.* at 42-43 of 70.)

Having reviewed the contractual provisions Plaintiff set forth in the TAC, the Court finds good grounds to reconsider its prior ruling that the Broker Addendum was clear, unambiguous, and controlling as a matter of law. Paragraph 27(d)'s express declaration that "terms of this Contract and Appendices shall control over any other document attached hereto or incorporated by reference" injects uncertainty as to whether the Contract controls over the Broker Addendum or vice versa. Moreover, according to the facts of the TAC, the Broker Addendum may not be valid, depending on the time it was signed by the parties and who signed it. Plaintiff in the TAC plausibly stated facts which, if true, suggest that the Broker Addendum does not control. *Cf. Jones v. D'Souza*, No. 7:06CV00547, 2007 WL 2688332, at *2-3 (W.D. Va. Sept. 11, 2007) (concluding that plaintiff's negligence claim against broker based on theory of vicarious liability was sufficient to survive motion to dismiss, despite that contract between broker and motor carrier stated that motor carrier was independent contractor, because plaintiff disputed authenticity of agreement).

---

[4] According to the face of the Broker Addendum, a representative from Lindt signed on "3/23/18." (Broker Addendum, ECF No. 48-1 at 31 of 31.) The first page of the Contract between Lindt & Sprüngli North America, Inc., ("Lindt") and Ryan, which crosses out "Motor Carrier" for "Broker" for Ryan, gives an effective date of February 1, 2018. (Contract, ECF No. 48-1 at 17 of 31.) The first paragraph of the Contract appears to say that it was "entered into as of the 23 day of 3 2018, ('Effective Date') by and between" Lindt and Ryan. (*Id.* at 18 of 31.) The signatory for "Carrier" on the last page of the Contract expressly hand-wrote after his signature, "Subject to signed 'Broker addendum to contract for truckload transportation.'" (*Id.* at 30 of 31.)

Consequently, the Court must consider what this conclusion means for Plaintiff's vicarious liability claims against Ryan.

<blockquote>
a) **Plaintiff states a plausible claim against Ryan based on theory it had a non-delegable duty because it was a "motor carrier"**
</blockquote>

Under New Mexico law, generally "an employer of an independent contractor is not responsible for the negligence of the contractor or his employees." *Saiz v. Belen Sch. Dist.*, 1992-NMSC-018, ¶ 10, 113 N.M. 387. An employer has no right to control the manner in which an independent contractor works, unlike an employee for whose negligence the employer is vicariously liable. *Id.* One exception to the independent contractor general rule is when the independent contractor has a non-delegable duty to protect another from harm based on a duty imposed by statute. *See Harris v. FedEx Nat. LTL, Inc.*, 760 F.3d 780, 783-84 (8th Cir. 2014) (citing Nebraska law); *Saiz*, 1992-NMSC-018, ¶ 10 ("The general rule has no application where the employer has nondelegable duties (1) arising out of some relation toward the public or the particular plaintiff (*e.g.*, duty of lessor to lessee), or (2) because of work that is specially, peculiarly, or inherently dangerous.").

According to 49 C.F.R. § 390.11, motor carriers must "require observance of" the duties or prohibitions imposed on drivers by the FMCSR. 49 C.F.R. § 390.11. Thus, an "interstate carrier is vicariously liable as a matter of law under the FMCSR for the negligence of its statutory employee drivers." *Morris v. JTM Materials, Inc.*, 78 S.W.3d 28, 39 (Tex. Ct. App. 2002) (citing, among others, *Rodriguez v. Ager*, 705 F.2d 1229, 1233-36 (10th Cir. 1983)). The question here is whether the allegations plausibly establish Ryan was acting as a motor carrier in this transaction, not a broker.

In *Essex Insurance Company v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292 (11th Cir.

2018), a cargo loss case, the Eleventh Circuit considered whether the defendant was a broker or liable for the damaged goods as a motor carrier. *See id.* at 1295-96. Relying on Department of Transportation regulations, the Eleventh Circuit reasoned:

> Broker means a person who, for compensation, arranges, or offers to arrange, the transportation of property by an authorized motor carrier. Motor carriers, or persons who are employees or bona fide agents of carriers, are not brokers within the meaning of this section when they arrange or offer to arrange the transportation of shipments which they are authorized to transport *and which they have accepted and legally bound themselves to transport.*

*Id.* at 1300-01 (quoting 49 C.F.R. § 371.2(a)) (italics added by Eleventh Circuit). The key question is whether the entity accepted legal responsibility to transport the shipment. *Id.* at 1301. If a party makes it clear in writing that it is merely acting as a go-between to connect the shipper with a third-party carrier, it will be considered a broker, but when no writing exists, "the question will depend on how the party held itself out to the world, the nature of the party's communications and prior dealings with the shipper, and the parties' understanding as to who would assume responsibility for the delivery of the shipment in question." *Id.* at 1302. This analysis is case-specific. *Id.*

Because the Court now finds ambiguity exists as to whether the Broker Addendum controls, it is not certain as a matter of law whether Ryan insulated itself from liability for this shipment by making "clear in writing that it is merely acting as a go-between to connect the shipper with a suitable third-party carrier." *See Essex*, 885 F.3d at 1302. The TAC alleges that Ryan accepted responsibility for the shipment, and thus, it is plausible that Ryan acted as a motor carrier in this transaction. *See Tryg Insurance v. C.H. Robinson Worldwide, Inc.*, 767 F. App'x 284, 287 (3d Cir. Apr. 19, 2019) (unpublished) ("If an entity accepts responsibility for ensuring the delivery of goods, then that entity qualifies as a carrier regardless of whether it conducted the physical transportation.").

Moreover, the way the parties characterized their own relationship, while evidence, is not necessarily dispositive if there is evidence of the traditional elements of agency. *See Harris*, 760 F.3d at 783 ("Whether a truck driver is acting as an employee or as an independent contractor depends on the facts underlying the relationship of the parties irrespective of the words or terminology used by the parties to characterize and describe their relationship.") (internal quotations omitted); *Jett v. Van Eerden Trucking Co., Inc.*, No. CIV-10-1073-HE, 2012 WL 37504, at *3-4 (W.D. Okla. Jan. 9, 2012) (noting that way owner of trailer and motor carrier characterized relationship does not end issue of vicarious liability because "the substance of the relationship would ultimately control"). Turning then to other facts in the TAC about the relationship between Ryan and the driver, Tawil, Plaintiff alleges that Ryan represented itself in portions of the contract and in the bill of lading as the carrier and controlled the manner of work performance – Ryan provided the schedule, logistics, mandatory documentation, tracking, and in-service communications en route. (*See* TAC ¶¶ 46-47, ECF No. 69 at 36-37 of 70.) These allegations indicate that Ryan arranged the transportation for the goods that it accepted and legally bound itself to transport and, thus, show a plausible claim of vicarious liability against Ryan. Accordingly, permitting amendment of a negligence claim against Ryan would not be futile. *Cf. Ciotola v. Star Transp. & Trucking, LLC*, 481 F.Supp.3d 375, 393 (M.D. Penn. 2020) (denying summary judgment to defendant who argued it was broker, not motor carrier, where some facts suggested it was motor carrier, such as directly communicating with driver, driver signing bill of lading as agent of defendant, and shipper only receiving communication from defendant for tracking shipment, even though some contrary facts suggested defendant only acted as broker); *Richwell Grp., Inc. v. Seneca Logistics Grp., LLC*, 425 F.Supp.3d 57, 61-62 (D. Mass. 2019) (concluding that defendant took on role of carrier in specific transaction by accepting responsibility

35

for transport of goods, despite fact that contract said defendant would contract directly with a carrier); *Courtney v. Ivanov*, Civil Action No. 3:13-227, 2015 WL 3866674, at *4-6 (W.D. Penn. June 23, 2015) (denying motion to dismiss negligence claim based on non-delegable duty against entity that plaintiff alleged was a broker, because status is determined by relationship between parties and complaint also alleged that entity acted as motor carrier with respect to shipment and assumed legal duty to transport load in safe manner; thus, issue was one of fact to be tested and developed during course of discovery).

### b) TAC states plausible claim that Ryan acted as Tawil's employer under common law agency theory

"New Mexico courts have employed an agency analysis to determine whether an individual is acting as an independent contractor or as an employee." *Celaya v. Hall*, 2004-NMSC-005, ¶ 11, 135 N.M. 115. In New Mexico, a "right to control analysis focuses on whether the principal exercised sufficient control over the agent to hold the principal liable for the acts of the agent," and where a sufficient right to control is present, "an employer-employee relationship usually exists." *Id.* ¶ 12. "The principal test is whether the employer has the right to control the manner in which the details of the work are to be accomplished, not the exercise of any control at all." *Scott v. Murphy*, 1968-NMSC-185, ¶ 10, 79 N.M. 697. When the right to control is not fundamentally a part of the relationship, a court may consider a number of factors when determining whether an individual is acting as an employee or independent contractor: (1) the degree of control the principal exercises over the details of the agent's work, (2) the type of occupation and whether it is usually performed without supervision; (3) the skill required for the job; (4) whether the employer supplies the instrumentalities or tools for the person doing the work; (5) the length of time the person is employed; (6) the method of payment, whether by time or job; (7) whether the work is part of the regular business of the employer; (8) whether the parties intended to create an

employment relationship; and (9) whether the principal is engaged in business. *See Loya v. Gutierrez*, 2015-NMSC-017, ¶¶ 55-56, 350 P.3d 1155; *Celaya*, 2004-NMSC-005, ¶ 15 (citing Restatement (Second) of Agency § 220(2)(a-j)).

As aforementioned, the TAC alleges that Ryan controlled the manner of work performance, such as by providing the schedule, logistics, mandatory documentation, tracking, and in-service communications en route. (*See* TAC ¶¶ 46-47, ECF No. 69 at 36-37 of 70.) Unlike the SAC, these new allegations indicate that Ryan may have maintained control over the means and methods of transportation, including the performance of the driver. The TAC thus plausibly states a claim for vicarious liability against Ryan based on an agency theory. *Cf. Riley*, 2017 WL 2501138, at *8 (concluding that genuine factual dispute existed on extent to which defendant had right to control details of motor carrier's delivery of load, and thus, factual question of whether agency relationship existed between defendant, the purported broker, and motor carrier at time of collision precluded summary judgment on vicarious liability theory against defendant); *Sperl v. C.H. Robinson Worldwide, Inc.*, 946 N.E.2d 463, 467, 471-72 (Ill. App. Ct. 2011) (concluding that jury's decision imposing liability for damages caused by tractor-trailer crash on freight broker was not against weight of evidence, because evidence showed broker controlled driver's work by specifying trailer length, specifying refrigerated trailer, dictating special instructions for load – pick up load at specified time, make daily check calls, and stay in constant communication with dispatchers – and imposing schedule backed by fines that pressured driver to violate federal regulations).

The determination of whether an entity was a carrier or broker or whether the driver was an employee or independent contractor of an entity are fact-specific inquiries. Because Plaintiff has alleged enough facts in the TAC to show plausibility, the Court will permit the negligence

claim against Ryan on a vicarious liability theory to move forward for further development of the factual record.

### b. The proposed complaint states a negligence claim against Russell Stover

As an initial matter, Russell Stover argues that claim preclusion bars re-litigation of these issues. The Court, however, does not find *res judicata* principles apt here where this case has not gone to final judgment and Plaintiff moved the Court to reconsider its decision in the same case. The federal rules permit both motions to amend and motions to reconsider, and the Court will apply the standards for those motions, rather than the doctrines of *res judicata* or claim preclusion.

### 1) The TAC states a plausible direct negligence claim against Russell Stover based on negligent hiring and unsafe scheduling

Plaintiff alleges that Russell Stover is directly negligent for his injuries because it demanded a time-is-of-the-essence contract from Stone Truck and Tawil, requiring the shipment be picked up at 1300 hours on October 27, 2018 in Corsicana, Texas, and delivered by 900 hours on October 30, 2018, in Watsonville, California. (TAC ¶ 52, ECF 69 at 44 of 70.) Plaintiff asserts that Russell Stover "unsafely scheduled the trip with a pick-up and delivery requirement which could not reasonably be accomplished without violating the hours-of-service laws of the Federal Motor Carrier Safety Act while driving in accordance with driving laws." (TAC ¶ 53, ECF No. 69 at 44-45 of 70.) Additionally, according to the TAC, Russell Stover retained the right to control how Ryan and Stone Truck completed their tasks, including selecting the trucking company and driver, dispatching the carrier or its driver directly, requiring the use of specific equipment, advancing a method to discount the cost of fuel, and reserving the right to reduce compensation for shipment delays. (*Id.*) Plaintiff alleges that Russell Stover knew or should have known that Stone Truck and Tawil were not properly qualified and selected. (*Id.*)

Russell Stover notes that in the prior round of briefing, Plaintiff asserted in his response to Ryan's motion to dismiss that the agreement between Ryan and Stone Truck "provides that Defendant Stone 'shall employ team drivers' where necessary." (Pl.'s Resp. 19, ECF No. 24 (citing Def. Ryan's Ex. 1, ECF No. 31-1).) Indeed, the Contract between Ryan and Stone Truck, previously made part of the record, provides that the "parties acknowledge that time is of the essence in the transportation of cargo under this Agreement and that monetary damages may accrue if the goods are not delivered within the time frame(s) specified in the rate confirmation, bill of lading or other shipping directives." (Broker-Contract Carrier Agreement ¶ 9, ECF No. 31-1.) In that same paragraph, the contract stated:

> Nothing in this Agreement shall be construed as requesting or requiring CARRIER to violate the federal safety regulations regarding hours of service set forth at 49 C.F.R. § 395 and/or applicable State regulations. Where CARRIER makes pick-up and delivery commitments to BROKER, BROKER reasonably relies on CARRIER's knowledge and expertise that such transit time is consistent with the safety regulations. *Where necessary CARRIER shall employ team drivers* and use all other reasonable means to meet its commitments without additional cost to BROKER.

(*Id.* (emphasis added).) Because the Contract required the use of "team drivers" when necessary, Russell Stover argues that team drivers "would have prevented driving excessive hours or overtiredness or other similar driver impairment alleged by Dixon." (Def. Russell Stover's Resp. 13, ECF No. 73.)

The Court finds that Plaintiff's allegations in the TAC concerning a negligence theory based on requiring a route that would reasonably require hours-of-service laws to be broken to be a *plausible* claim of liability, given that Tawil is alleged to have impaired alertness when he caused the collision. While Russell Stover's team-driving argument may ultimately provide a defense to the negligent scheduling theory of liability, the Court does not have the record before it to determine that defense as a matter of law. For example, the federal hours-of-service laws are not

cited in the record, and this issue may involve factual questions such as what the parties would have anticipated the total hours of driving to be with a single driver versus a team of drivers, or what the standards are in the industry concerning team drivers. Determining the merits of the team-driver defense is best left on a fully developed summary judgment record. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (explaining that Rule 12(b)(6) motion tests sufficiency of complaint but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses"). Allowing an amendment to add a negligent scheduling claim is not clearly futile.

Regarding the negligent-hiring claim, Russell Stover asserts that the non-conclusory allegations and the documents upon which Plaintiff's factual assertions are based show that Russell Stover contracted with Ryan only, not with Stone Truck or Tawil. Accordingly, Russell Stover contends that the new factual allegations about Tawil's citation history and Stone Truck's safety rating do not bear on Russell Stover's liability because no evidence or non-conclusory facts show that Russell Stover hired either of them. In the TAC, Plaintiff alleges that Russell Stover arranged the shipment by hiring Ryan and Stone Truck to perform its duties as a motor carrier. (TAC ¶ 15, ECF No. 69 at 27 of 70.) Other allegations indicate that Ryan arranged for Stone Truck and Tawil to transport the shipment of Russell Stover's goods, which Ryan legally and contractually bound itself to transport. (*See id.* ¶ 20, ECF No. 69 at 28 of 70. *See also* TAC ¶ 8, ECF No. 69 at 26 of 70 (stating that Stone Truck hauled Russell Stover's cargo "under the contractual exclusive direction and control of Defendant Ryan Transportation and under the statutory direction and control of all Defendants" pursuant to the FMCSA; *id.* ¶ 46, ECF No. 69 at 36-37 of 70 (asserting Ryan "was negligent in the selection of Defendant Stone Truck Line" and "by Agreement the

transportation of the subject shipment was under the exclusive control of Defendant Ryan Transportation").)

Paragraph 11 of the Contract between Russell Stover and Ryan states: "CARRIER, if not preapproved by SHIPPER as a 'BROKER' shall utilize no other carriers *without the prior consent of SHIPPER*." (Contract, ECF No. 48-1 at 23 of 31 (italics added).) As discussed *supra*, the Court finds ambiguities in the Contract exist as to whether the terms of the Contract or Broker Addendum control, and Plaintiff has alleged facts indicating that the Broker Addendum may not be valid. There are therefore some factual allegations indicating that Russell Stover may have approved the selection of Stone Truck, and thus, Plaintiff's assertion that Russell Stover selected Stone Truck is plausible.

### 2) The TAC states a plausible negligence claim against Russell Stover based on vicarious liability under an agency theory

In this Court's prior Memorandum Opinion and Order, the Court ruled that Russell Stover was not acting as a motor carrier or a statutory employer of Tawil as a matter of law because, according to the allegations of the complaint, it was acting as a shipper in this particular transaction and hired Ryan to arrange for the shipment of its goods. (*See* Mem. Op. and Order 27, ECF No. 57.) Plaintiff asks the Court to reconsider this ruling, because according to the TAC, Russell Stover is an experienced, knowledgeable, licensed motor carrier who retained the right to control how Ryan and Stone Truck completed their tasks. (TAC, ¶¶ 53, 90, ECF No. 69 at 45, 60-61 of 70.) In addition, Plaintiff asserts that Russell Stover is the statutory employer of Tawil and liable for his acts. (*Id.*)  Russell Stover argues that these new allegations are speculative, hoped-for conclusions, and that they do not establish that it acted as a motor carrier in this transaction as a matter of law.

### a) Russell Stover did not have a non-delegable duty as a "motor carrier"

As discussed *supra*, an exception to the general rule that one who employs an independent contractor is not liable for harm caused by the contractor's employees is if the employer has a nondelegable duty imposed by statute to protect another from harm. *Harris*, 760 F.3d at 783-84. To the extent Plaintiff's vicarious liability theory is based on Russell Stover acting as a motor carrier in this transaction, the Court rejects this theory as a matter of law based on the regulatory definitions of motor carrier, broker, and shipper. In 49 C.F.R. § 390.11, the FMCSR imposes the duties of drivers onto motor carriers. *See Harris*, 760 F.3d at 784. Entities may constitute motor carriers "when they arrange or offer to arrange the transportation of shipments which they are authorized to transport and which they have accepted and legally bound themselves to transport." 49 C.F.R. § 371.2.

Plaintiff alleges that Russell Stover is the shipper of the chocolate cargo, and that it arranged the transport of the shipment by hiring Ryan and Stone Truck Line to perform its duties as a motor carrier as its agents with the objective of transporting its goods for compensation paid by Russell Stover. (TAC ¶ 15, ECF No. 69 at 27 of 70.) While Russell Stover could have transported its shipment as the motor carrier, the contract with Ryan shows that it did not accept and legally bind itself to transport its own goods, and Russell Stover was thus acting as the shipper in this transaction, not a motor carrier. *Cf. Harris*, 760 F.3d at 784-85 (affirming summary judgment for FedEx on non-delegable duty theory of liability because FedEx acted as shipper in specific transaction at issue where it purchased transportation services of carrier); *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 59 (2d Cir. 2012) ("The shipper is the entity that purchases the transportation services of the carrier."). The Court therefore finds that adding a theory of liability based on Russell Stover being the statutory employer of Tawil based on the FMCSA and FMCSR would be futile.

> **b)** **The TAC plausibly states a claim against Russell Stover under common law agency theory**

Plaintiff, however, also asserts in the TAC additional facts that Russell Stover, even if acting as the shipper, retained a right to control the manner in which Tawil transported the shipment such that it should be held liable for the acts of its agent, Tawil. This agency theory, while related to the non-delegable duty/statutory employer theory, is distinct. The non-delegable duty theory focuses on the meaning of "motor carrier" in the federal regulatory scheme, whereas the agency theory focuses on the degree of control an entity has over the driver under applicable state law. *See Crocker v. Morales-Santana*, 2014 ND 182, ¶¶ 28-29, 854 N.W.2d 663 (separately analyzing theories of statutory employee doctrine and right-to-control theory of liability). As discussed above, the key question on an agency theory is whether Plaintiff alleged sufficient facts to plausibly show that Russell Stover exercised sufficient control over Tawil to hold it liable for his acts. *See Celaya*, 2004-NMSC-005, ¶¶ 11-12; *Crocker*, 2014 ND 182, ¶ 31 (explaining that liability under Restatement (Second) of Torts § 414 occurs only where employer controls method, manner, and operative details of independent contractor's work such that "the contractor is not entirely free to do the work in his own way") (quoting *Fleck v. ANG Coal Gasification Co.*, 522 N.W.2d 445, 448 (N.D. 1994)).

Plaintiff asserts in the TAC that Russell Stover retained control over the method, manner, and operative details of Tawil's works by selecting the trucking company and driver, dictating the delivery timeline, dispatching the carrier or its driver directly, dictating the transportation route by providing a discounted method for the cost of fuel, and requiring the use of specific equipment, such as the type of trailer, communication system, and GPS tracking system, among other things. (TAC, ¶¶ 53, 90, ECF No. 69 at 45, 60-61 of 70.) As with Ryan, these allegations, which the Court

must assume are true at this stage, plausibly suggest that Russell Stover may have controlled the method, manner, and details of Tawil's work such that he was not entirely free to do the work his own way. Whether the evidence will ultimately support Plaintiff's claims is a decision better left for the fact finder or on summary judgment. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial").

### c. The TAC does not plausibly state a claim under a joint enterprise theory

Plaintiff alleges that Russell Stover, Ryan, and Stone Truck pooled their resources and efforts to accomplish the goal of using a truck and driver to transport Russell Stover's goods, and that they each were authorized to control the performance of the shipment because they all qualified as motor carriers. (TAC ¶¶ 54, 100-103, ECF No. 69 at 46, 66-67 of 70.) Further, the TAC states that these three entities shared in any profits or losses from the delivery of the shipment and were members of a joint enterprise, and thus, Ryan and Russell Stover are vicariously liable for Stone Truck's and Tawil's acts or omissions. (*Id.* ¶¶ 54, 104-07)

Under New Mexico law, a party may be liable for the negligence of its joint venturers. *See Schall v. Mondragon*, 1964-NMSC-107, 74 N.M. 348 ("If two or more persons unite in a joint prosecution of a common purpose, under such circumstances that each has the authority to control the means employed to execute such purpose, the negligence of one is chargeable to the other...."). "A joint venture is formed when the parties agree to combine their money, property or time for conducting a particular business venture and agree to share jointly in profits and losses, with the right of mutual control over the business enterprise or over the property." *Quirico v. Lopez*, 1987-NMSC-070, ¶ 9, 106 N.M. 169. Russell Stover argues that Plaintiff does not allege in the TAC any right of mutual control over the business enterprise or over the property. Moreover, it asserts

that the allegation that they share in profits or losses from delivery of the shipment is sheer speculation not based on any contract with a profit/loss provision. It further contends that the Bill of Lading belies any sharing of losses or profits, as it states that Stone Truck agreed to hold Ryan and its customer harmless for any loss or damage to cargo and from all and any liability arising from Stone Truck's operations. (*See* Def. Russell Stover's Resp. 21, ECF No. 73 (quoting ECF No. 31-3 at 2).)

In the TAC, Plaintiff alleges that Russell Stover, Ryan, and Stone Truck "collectively pooled their resources, efforts, and knowledge to accomplish their common purpose of utilizing a semi-truck to efficiently transport Defendant Russell Stover's goods, thereby creating a joint proprietary interest in this transportation supply chain." (TAC ¶ 102, ECF No. 69 at 66-67 of 70.) According to the TAC, Russell Stover, Ryan, and Stone Truck "would share in the profits flowing from the reduction in transportation costs." (*Id.* ¶ 104.) Plaintiff alleges Defendants would share in any losses incurred because Ryan and Stone Truck agreed to accept a reduction in their compensation caused by delivery delays. (*Id.*) Plaintiff further asserts they "possessed the right, under authority conferred by" the FMCSA and FMCSR "to voice their concerns related to and control the performance of this transportation supply chain." (*Id.* ¶ 103.)

"As a general rule, in order to constitute a joint adventure there must be a community of interest in the performance of a common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and a duty to share in any losses which may be sustained." *Cooper v. Curry*, 1978-NMCA-1-4, ¶ 22, 92 N.M. 417 (quotation omitted). Plaintiff's allegations fall short of showing non-conclusory facts that plausibly indicate that Russell Stover, Ryan, and Stone Truck had a joint *proprietary* interest in the transportation supply chain or a right to share in profits. Plaintiff's allegations that the transportation supply chain's

purpose was to minimize the cost of transporting Russell Stover's goods and that they would share in profits flowing from a reduction in transportation costs is insufficient to show that the parties agreed to share in the business venture's profits. Thus, amendment to add this claim against Ryan and Russell Stover is futile. *Cf. Rogers v. Anheuser-Busch, Inc.*, 491 F.3d 1165, 1166, 1171 (10th Cir. 2007) (holding that beer supplier who entered into sponsorship agreement with bar hosting concert was not liable for injuries sustained by driver after collision with intoxicated patron of bar based on joint enterprise theory because, while beer supplier benefitted from success of concert by selling more beer, entities did not share profits with one another; as seller of beer, it was simply paid for its product); *Riley*, 2017 WL 2501138, at *10-12 (concluding as matter of law that there was no joint venture where there was no evidence of express or implied agreement between broker and motor carrier to form joint venture and agreement's independent contractor language clearly disavowed joint-venture relationship; there was no profit or control-sharing over enterprise; and they did not share risks, losses, or control); *Cooper*, 1978-NMCA-104, ¶¶ 22-23 (affirming trial court's refusal to instruct jury on joint venture theory that doctor and hospital had community of interest in treating plaintiff because record did not show doctor had proprietary interest in hospital's property, that there existed a mutual right to control, or that doctor was to share in the hospital's profits or losses).

**IT IS THEREFORE ORDERED** that

1. Plaintiff's *Motion for Leave to File Supplemental Evidence in Support of Plaintiff's Motion for Leave to File Amended Complaint and Reconsider its Order Dismissing Defendants Ryan Transportation Service, Inc. and Russell Stover Chocolates, LLC (Doc. 69)* (**ECF No. 81**) is **GRANTED** but for the limited purpose described herein; and

2.   Plaintiff's *Motion for Leave to File Amended Complaint and Reconsider its Order Dismissing Defendants Ryan Transportation Service, Inc. and Russell Stover Chocolates, LLC (Doc. 57)* (**ECF No. 69**) is **GRANTED in part and DENIED in part**. The motion is **GRANTED** to the extent that Plaintiff may file his proposed amended complaint (ECF No. 69 at 24-70) to assert negligence claims against Defendants Ryan Transportation Service, Inc., and Russell Stover Chocolates, LLC. The Court, however, will **DENY** Plaintiff's motion to amend to the extent he seeks to assert a joint enterprise theory of liability (Count V) and a statutory employer theory of liability against Defendant Russell Stover, as those theories are futile as a matter of law.


_____
SENIOR UNITED STATES DISTRICT JUDGE